UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DEBORAH D. PETERSON, §<br>Personal Representative of the Estate of §<br>James C. Knipple (Deceased), *et al.*, §<br>　　　　　　　§<br>　　　　*Plaintiffs*, §<br>　　　　　　　§<br>vs. §<br>　　　　　　　§<br>THE ISLAMIC REPUBLIC OF IRAN, *et al.*, §<br>　　　　　　　§<br>　　　　*Defendants*. § | MISCELLANEOUS ACTION H-12-233 |

## MEMORANDUM OPINION & ORDER

Pending before the court is plaintiffs' motion for entry of an order to permit attachment and execution on the default judgment. Dkt. 2. After considering plaintiffs' arguments and the applicable law, plaintiffs' motion is DENIED.

### I. BACKGROUND

On the morning of October 23, 1983, Ismalal Ascari, an Iranian citizen, drove a 19-ton truck containing a large explosive device behind the U.S. Marine barracks in Beirut, Lebanon. *Peterson v. Islamic Republic of Iran* (*Peterson I*), 264 F. Supp. 2d 46, 56 (D.D.C. 2003). He crashed through a wire fence and wall of sandbags, entered the barracks, and detonated the device. *Id.* The resulting explosion destroyed the four-story barracks and killed 241 American servicemen. *Id.* The evidence recovered at the site linked the attack to Hezbollah, a Lebanese Shiite Muslim group that was radicalized by Iran after Israel's 1982 invasion of Lebanon. *Id.* at 51. At the time, Hezbollah received extensive financial and military support from Iran through the Iranian Ministry of

Information and Security ("MOIS").[1]  *Id.* at 53.  By the fall of 1983, the MOIS approved the Beirut attack in consultation with the Iranian National Security Council, the prime minister, and Iran's supreme religious leader, Ayatollah Ruhollah Khomenei.[2]  *Id.*

In 2001, nearly 1000 plaintiffs, most of whom are family members of the 241 servicemen, sued Iran and the MOIS in the United States District Court for the District of Columbia.  *Id.* at 48.  In July 2003, the court found that Hezbollah perpetrated the Beirut bombing with the aid of the defendants and that the plaintiffs had "established their right to obtain judicial relief . . . ."  *Id.*  The court then directed special masters to recommend the appropriate amount of damages for each of the 1000 plaintiffs.  *Peterson v. Islamic Republic of Iran* (*Peterson II*), 515 F. Supp. 2d 25, 37 (D.D.C. 2007).  On September 7, 2007, the court entered a default judgment against Iran and the MOIS, jointly and severally, for $2,656,944,877.  *Id.* at 60–66.  The court also ordered plaintiffs to serve defendants with a copy of the judgment consistent with the requirements of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1608(e).  Dkt. 1, Ex. 1 at 23.

On April 17, 2012, plaintiffs registered the judgment with the Southern District of Texas pursuant to 28 U.S.C. § 1963.  Dkt. 1.  Plaintiffs now move for a judicial finding under 28 U.S.C. § 1610(c) that a reasonable period of time has elapsed following entry of judgment and the giving of proper notice of the default judgment under section 1608(e).  Dkt. 2 at 1.  With this finding,

---

[1] Mohammad Reza Pahlavi, the Shah of Iran, created the MOIS as a secret police force before his overthrow in 1979.  *Peterson I*, 264 F. Supp. 2d at 53.  After the Islamic Revolution, the revolutionary government restyled the Ministry as the principal intelligence agency within the new government.  *Id.*

[2] Under the 1979 Constitution, the Supreme Leader (more accurately translated as the "Leader of the Revolution") is the highest official in Iran and maintains extraordinary powers over all branches of government, purportedly to defend the ideals of the Islamic Revolution.  He delineates the general policies of the Republic, appoints key officials, and issues decrees for national referenda.  QANUNI ASSASSI JUMHURII ISLAMAI IRAN [THE CONSTITUTION OF THE ISLAMIC REPUBLIC OF IRAN] arts. 110, 113; 1358 [1979]; Abteen Karimi, *Iran, Democracy, & International Law*, 27 MD. J. INT'L L. 304, 316 (2012).

2

Plaintiffs intend to serve a writ of garnishment upon Royal Dutch Shell, Inc. in this district. *Id.* at 5.

## II. LAW & ANALYSIS

### A. Background Law on the FSIA

Beginning in 1812, the United States generally afforded foreign sovereigns nearly absolutely immunity from suit in U.S. courts. *The Schooner Exch. v. M'Faddon*, 11 U.S. (7 Cranch) 116 (1812). The Supreme Court decided *The Schooner Exchange* on comity grounds, however, and deferred to the Executive Branch on whether to make an exception and take jurisdiction over an action against a foreign sovereign. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487, 103 S. Ct. 1962 (1983). After *The Schooner Exchange*, the U.S. Department of State generally requested immunity in all actions against friendly foreign sovereigns. *Id.* But in 1952, the State Department revised its position, adopting the "restrictive" theory of diplomatic immunity, limiting immunity to suits involving a sovereign's official, public acts, but permitting claims arising out of a sovereign's commercial acts. Letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 711, 96 S. Ct. 1854 (1976) (App. 2 to opinion of WHITE, J.).

But the restrictive theory proved difficult in application, as the Executive Branch was criticized for suggesting immunity in cases based on alleged political considerations alone. *Verlinden*, 461 U.S. at 487. In 1976, Congress passed the FSIA in response to these criticisms, codifying the restrictive theory of foreign sovereign immunity and assuring "litigants that . . . decisions are made [by courts] on purely legal grounds under procedures that insure due process." H.R. REP. NO. 94-1487, at 7 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6606. Under the FSIA,

the general rule is that a foreign government is immune from state and federal jurisdiction unless a statutory exception applies. 28 U.S.C. §§ 1604–1605, 1607.

As originally passed, the FSIA did not contain a terrorism exception. After Congress passed the Antiterrorism and Effective Death Penalty Act in 1996, however, sovereigns designated as state sponsors of terrorism are no longer immune from civil suits for terrorist acts. *See id.* § 1605A(a)(1) (original version at § 1605(a)(7)). The State Department has continuously designated Iran as a state sponsor of terrorism since January 19, 1984, a designation due, in part, to the 1983 Beirut attack. 50 U.S.C. app. § 2405(j)(3); 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (notice from Secretary of State George P. Shultz designating Iran a state sponsor of terrorism). In the *Peterson* case, filed in 2001, the court found that it had subject-matter and personal jurisdiction over the defendants based on the terrorism exception to the FSIA. *Peterson I*, 264 F. Supp. 2d at 60. As stated above, the court also found that defendants were responsible for the deaths of the 241 servicemen and awarded the plaintiffs $2.6 billion in damages. *Id.*; *Peterson II*, 515 F. Supp. 2d at 60–66.

### B. *Plaintiffs' Motion for a 1610(c) Order*

Section 1610(c) of the FSIA, which governs attachment of property and execution of judgments, states:

> No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

28 U.S.C. § 1610(c). This provision gives the sovereign defendant the opportunity "to evaluate and respond to any court judgment entered against it which could subject its property and interests in the

United States to attachment or execution." *Agudas Chasidei Chabad of the United States v. Russian Fed'n*, 798 F. Supp. 2d 260, 271 (D.D.C. 2011).

As a threshold matter, the court must first determine whether plaintiffs provided proper notice of the default judgment to the defendants, as required by 28 U.S.C. § 1608(e). *Id.* at 267. Section 1608(e) states that a copy of the default judgment "shall be sent to the foreign state or political subdvidision in the manner prescribed for service in this section." Section 1608(a), which exclusively governs service on a foreign state or political subdivision, "prescribes four methods of service, in descending order of preference. Plaintiffs must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008). The statute requires service (1) "in accordance with any special arrangement . . . for service between the plaintiff and the foreign state"; (2) "by delivery . . . in accordance with an applicable international convention"; (3) "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court"; or (4) "by sending two copies" to the State Department, which "shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." 28 U.S.C. § 1608(a)(1)–(4). Congress's use of the term "shall" with regard to the manner of service makes clear that these are the sole procedures for service on a foreign sovereign. *See Magness v. Russian Fed'n*, 247 F.3d 609, 615 (5th Cir. 2001); H.R. REP. NO. 94-1487, at 24 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 6623 (committee report stating that "section 1608(a) sets forth the *exclusive procedures* for service on a foreign state") (emphasis added). Based

on this language, the Fifth Circuit has held that nothing less than strict compliance is permitted for service on a foreign state or its political subdivision. *Magness*, 247 F.3d at 613, 615 (holding that by sending process to Boris Yeltsin, then-President of the Russian Federation, through the Texas Secretary of State, rather than requesting service by the clerk of court, plaintiffs did not strictly comply with § 1608(a)(3)).[3] In so doing, the *Magness* court rejected the more lenient "substantial compliance" standard, which waives strict compliance so long as the defendant received actual notice of the complaint and suffered no prejudice. *Id.*; *cf. Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1129 (9th Cir. 2010) (permitting substantial compliance with the FSIA's service requirements and excusing plaintiffs' failure to send process through the clerk of court, as required by the terms of § 1608(a)(3)).

Here, plaintiffs obtained a default judgment in the underlying action on September 7, 2007. *See* Dkt. 1, Ex. 1. Plaintiffs contend that Iran received service of the default judgment by mail on October 26, 2010 and through diplomatic means on March 2, 2011, but the affidavit in support of their motion indicates that Iran's Ministry of Foreign Affairs was served on January 10, 2008 by DHL Worldwide Mail Service. *Compare* Dkt. 2 at 2 ¶¶ 2–3, *with id.*, Ex. B at 2 ¶ 4. This indicates that plaintiffs attempted to serve Iran under section 1608(a)(3). However, the letter accompanying the default judgment was sent directly by Thomas Fortune Fay, an attorney, on his office's letterhead,

---

[3] *Accord Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153–54 (D.C. Cir. 1994) (requiring strict adherence to the service rules under § 1608(a) and declining to excuse plaintiffs' service of process upon the Bolivian Ambassador and Consul General in Washington, D.C. rather than the Bolivian Ministry of Foreign Affairs or the Secretary of State under § 1608(a)(3)–(4)); *Alberti v. Empresa Nicaraguense De La Carne*, 705 F.2d 250, 253 (7th Cir. 1983) (holding that service upon the Nicaraguan ambassador instead of the head of the foreign affairs ministry failed to give Nicaragua proper notice of suit); *Gray v. Permanent Mission of The People's Republic of the Congo to the United Nations*, 443 F. Supp. 816, 821 (S.D.N.Y.) (holding that under section 1608(a), "informal notification through channels clearly outside the obvious requirements of the applicable statute cannot be substituted for those which meet the requirements"), *aff'd*, 580 F.2d 1044 (2d Cir. 1978).

and was not "addressed and dispatched by the clerk of the court" as required under the FSIA. § 1608(a)(3). Accordingly, plaintiffs have not demonstrated that they strictly complied with the service requirements of § 1608(a) under the FSIA, and their motion is DENIED.

### III. CONCLUSION

In order to execute a default judgment against a foreign sovereign, plaintiffs must first demonstrate that service of the judgment strictly complies with the statutory requirements of section § 1608(a) of the Foreign Sovereign Immunities Act. The record evidence in this case shows service of the default judgment by a private citizen rather than the clerk of court, as mandated by section 1608(a)(3). While this defect may appear trivial, the Fifth Circuit has held on similar facts that private service by mail is insufficient, explaining that to depart from the statutory scheme would disregard congressional intent and U.S. diplomatic interests in ensuring proper service of foreign governments. *Magness*, 247 F.3d at 616, 619 (citing the U.S. government's arguments in its *amici* brief that "the United States has fought jurisdiction in instances where foreign attorneys have attempted to serve the United States via non-authorized government employees"). Plaintiffs' motion is DENIED.

It is so ORDERED.

Signed at Houston, Texas on September 27, 2012.

_____
Gray H. Miller
United States District Judge